E-FILED
Tuesday, 05 November, 2019  11:45:35 AM
Clerk, U.S. District Court, ILCD

**IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | |
|---|---|
| KYM N-W,<br>　　　Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>　　　Defendant. | Case No. 4:18-cv-04212-SLD-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 9) and the Defendant's Motion for Summary Affirmance (Doc. 11).  This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Kym N-W filed an application for disability insurance benefits (DIB) on March 6, 2014 and alleged disability beginning on August 30, 2013.  Her claim was denied initially on June 27, 2014 and upon reconsideration on January 23, 2015.  After Kym filed a request for hearing concerning her DIB application, a hearing was held before Shreese M. Wilson (ALJ) on May 5, 2016.  Following the hearing, Kym's claim was denied on July 15, 2016.  The Appeals Council (AC) remanded

---

[1] References to the pages within the Administrative Record will be identified by AR [page number].  The Administrative Record appears as (Doc. 6) on the docket

Kym's case on July 28, 2017, and it also noted that Kym filed a subsequent application for supplemental security income (SSI) on May 18, 2017 which the ALJ should consider on remand whether to consolidate with Kym's DIB claim.

A remand hearing was held on December 19, 2017 before the same ALJ. Following that second hearing, Kym's DIB and SSI claims were consolidated and both were denied on February 27, 2018. Her request for review by the AC by was denied on September 8, 2018, making the ALJ's February 2018 Decision the final decision of the Commissioner. Kym filed the instant civil action seeking review of the ALJ's Decision on November 6, 2018.

## II

At the first hearing on May 5, 2016, Kym was 40 years old and lived with her wife and 11-year-old son in a two-story home in which she went up and down the stairs two or three times per day. She alleged the following conditions limited her ability to work:  failed back surgical syndrome; back injury; depression; arthritis; and left leg weakness. AR 374. She testified she stopped working in 2013 because she started to have more issues with the numbness in her legs and her back "couldn't handle that type of work anymore." AR 63. Her last job was as a certified nursing assistant (CNA).

 Kym testified that she did not look for work that was not as physically demanding as her CNA job because of the falls she had. She elaborated that her condition had changed since January 2013 in that her leg function became worse, she started to use a cane, and she fell more. She testified she had fallen down the stairs in her home before. She said she still had pain while on pain medication. Though Kym had back surgery in May 2008, it did not relieve her symptoms and additional surgery was not recommended. She testified that the nerve damage she had was "unfixable" and she had gradually more numbness and nerve pain. AR 64. She said her pain was located in her lower back and left leg, and it was constant

2

discomfort and shooting pains at times.  She further stated that "anything physical" triggered more severe pain and "sweeping a floor or vacuuming [was] very painful for [her]."  AR 65.

The ALJ noted Kym came into the hearing with a cane.  Kym explained she could walk a short distance without the cane, but she used it for extra stability that her left leg did not provide her.  She estimated she could not go more than 10 feet without her cane and guessed she could walk 30 to 40 feet "maybe" with it.  AR 66.  She said she could be on her feet 10 minutes before she had to sit down due to lower back pain.  She would have to sit 15 to 20 minutes before she could stand up again.  Though Kym later testified that she could sit for 30 to 45 minutes at one time before she would have to stand up and change positions due to lower back pain.  She said walking too much caused her to fall.  Kym testified that she had three to four good days per month, 10 to 15 "okay" days per month, and 10 to 12 bad days per month.  AR 67.  She said nothing triggered a bad day and that "some days" she just woke up in more pain.  AR 68.  Daniel Arnold, D.O., Kym's family doctor, then-currently treated her for her back pain.

Kym also testified that she could lift a gallon of milk and could lift more, "but then I'm just hurting myself."  AR 73.  In a typical day, Kym sat in her chair and then rotated from chair to standing to moving around though she said some days she did not even get out of bed because she was in "that much pain."  AR 74.  Her wife did most of the cooking and shopping.  Kym spent "maybe" an hour per day on the computer, a half hour at a time.  *Id*.  Her wife had to be home while Kym showered as she had fallen in the shower before.  Kym liked to take pictures and did so a couple times per month around her home.  She used to ride her horse but said she could no longer do so due to her left leg issues.  She last rode her horse the previous year.

3

Upon questioning by her attorney, Kym testified that 50 feet would be too much for her to walk, even with her cane. She "suppose[d]" she fell three or four times per week, and sometimes used her walker to provide more stability. AR 77-78. She used her walker towards the evening after her leg became more painful and numb during the day. She said she laid down every couple of hours for 30 minutes during the day. Her hydrocodone and morphine made her tired. The VE was then questioned by the ALJ and Kym's attorney.

At the December 19, 2017 hearing, Kym was 42 years old, divorced, and she remained responsible for her 13-year-old son's care. She lived in a different house than before, though there were still stairs to climb. Her mother and ex-wife helped her get around to doctors' appointments and the grocery store. Kym confirmed she had not worked since the 2016 hearing and had not looked for any work because she could not sit for long, stand for long, her leg went numb "all the time," and she fell "frequently." AR 40. She continued to use a cane and explained that Dr. Arnold prescribed it for her "[p]robably" two years ago. AR 40. She last saw Dr. Arnold for chronic back pain in June 2017, but she had not seen him since because he changed his practice. Kym had a new doctor.

Kym additionally testified that since the last hearing in May 2016, she had more back pain, her leg became numb every time she sat, and she had more leg pain throughout the day. She no longer did any housework. The ALJ pointed out that a physical therapy record provided Kym did not rest her upper extremity like she was supposed to; she was doing some kind of woodworking and painting. Kym explained she stripped the wood of old pieces of furniture, that it was something she did "all the time" years ago, and she currently did it "off and on." AR 43. Upon questioning by her attorney, Kym clarified that she used a paint stripper chemical rather than a sander to strip the furniture. She also stated that before she moved out of the house where her supplies were, she did woodworking

4

"[m]aybe twice a month for a couple of hours[.]"  AR 44.  Her painting consisted of painting the furniture she stripped.  Kym also provided that in the four months following the May 2016 hearing, her left leg continuously became worse.  She said she still had "okay" days but no longer had good days.  AR 45.

> The ALJ presented the VE with the following hypothetical:
>
> [A]n individual that's the same age that the claimant is.  This individual is currently 42.  This individual has the same high school education that the claimant has, and the same work history that the claimant has.  Initially, I would like for you to assume that this individual would be limited to lifting or carrying ten pounds occasionally, and no more than ten pounds.  This individual would be limited to two hours of standing and walking in an eight-hour workday.  They could sit the remainder of the day.  This individual should never climb ladders, ropes or scaffolds; no more than occasionally climb ramps or stairs; no more than occasionally stoop, kneel, crouch or crawl.  This individual should avoid concentrated exposure to irritants, such as dust, fumes, odors, gases and poor ventilation.  This individual should avoid concentrated exposure to unprotected heights and hazardous machinery.

AR 47.  The VE testified that such an individual would not be able to return to Kym's past work.  There were, however, other sedentary, unskilled jobs such an individual could perform.  The VE further testified that the individual's use of a cane or assistive device for ambulation to and from the workstation would not affect the individual's ability to maintain the identified jobs.  Nor did the individual's limitation to no more than one total hour standing and walking and sitting the remainder of the day.  The ALJ then posed the individual would need to alternate between sitting and standing one time every hour throughout the course of an eight-hour workday and would remain in the alternating position up to five minutes.  The VE answered that limitation would also not affect the individual's ability to perform those jobs where the tasks were such that the individual would not necessarily lose production time.  The frequency of

alternating position every 30 minutes instead of every hour while doing tasks that could be done while alternating in that manner also did not affect the individual's ability to perform the identified jobs. The individual's need to not only alternate positions but walk away from the workstation so that she was losing five minutes of productivity every 30 minutes continuously throughout the workday *would* affect the individual's ability to maintain those jobs. The individual would also lose her job if she had at least two unscheduled call-ins a month where she did not show up for work.

Kym's attorney elicited from the VE that the individual's need to have at least one of her upper extremities occupied by an assistive device during the five minutes standing every half hour could erode productivity to preclude employment. The VE explained that if productivity was lowered by 10%, an employer would not tolerate that. Finally, the identified jobs needed both hands for the requisite productivity.

### III

In her February 27, 2018 Decision, the ALJ determined Kym had the following severe impairments: degenerative disc disease of the lumbar spine status-post surgery, degenerative disc disease of the cervical spine, breathing disorder, and status-post left arm/shoulder injury. AR 16. The ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant as the [RFC] to perform sedentary work [i.e., she can lift no more than 10 pounds and she can stand and/or walk no more than 2 hours and can sit for 6 hours, each in an 8-hour workday, but has no limitation on the ability to sit, as defined in 20 CFR 404.1567(a) and 416.967(a) except she can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs and can occasionally balance, stoop, kneel, crouch and crawl. In addition, she must avoid concentrated exposure to unprotected heights and hazardous machinery. She must further avoid concentrated exposure to

respiratory irritants such as dusts, fumes, odors, gases and poor ventilation.

AR 18.  The ALJ summarized Kym's 2016 hearing testimony and contrasted her 2017 hearing testimony; she no longer did housework and if she sat for very long, her legs went numb.

The ALJ recognized that Kym was "notably restricted by her musculoskeletal ailments and breathing impairment; i.e., the existence of these physical condition results in significant functional limitations."  AR 19.  The ALJ pointed out Kym's "long history of lumbar degenerative disc disease dating at least to 2008 when she underwent lumbar fusion surgery at L4-S1" and that she "complained and treated for low back pain and chronic lower left extremity pain and sporadic leg and foot numbness from and after early in September 2013, and through the remainder of the relevant record."  AR 19.  The ALJ noted that in "many instances" Kym's complaints were secondary to recent falls.  *Id*.  The ALJ listed Kym's prescribed treatment including a TENS unit[2] and physical therapy (PT).

As for physical therapy, Kym underwent a course of PT through January and February 2014 which was "generally well tolerated," but the "inability to correct cane use with the wrong hand and intermittent setbacks outside of treatment resulted in her discharge without meeting most of the therapy goals."  AR 19 (citing various records).  A March 3, 2014 note provided Kym reported she was at a friend's house the previous weekend and "sat on a wooden chair around 4- 4 1/2 hours, did move around a little but not [sic] get up and move 5-10 minutes at a time."  AR 524.  A March 6, 2014 note provided Kym reported "did slip and

---

[2] "Transcutaneous electrical nerve stimulation (TENS) is a therapy sometimes used to treat localized or regional pain."  https://www.mayoclinic.org/tens/expert-answers/faq-20058378 (last visited Oct. 18, 2019).

fall 2 days ago in her driveway on the ice bruising (L) shin." AR 527. The ALJ addressed the emergency room records pertaining to Kym's fall from her horse while riding in May 2015. At that time, Kym was diagnosed with cervical strain and she continued to complain of and treat for neck pain and left hand tingling in the fingers. Kym was referred by Dr. Arnold to PT through the months of October and November 2015. Upon her discharge from PT in early December 2015, Kym had met maximum medical improvement and had met two of three therapy goals but did not fully achieve them; she still had deficits in her global cervical active range of motion and endorsed ongoing cervical pain. Next, the ALJ observed Kym "obtained sporadic medical care with complaint of lumbar pain in June 2016, and left arm pain in February 2017." AR 20. The ALJ included Dr. Arnold's examination of Kym in August 2016 included reduced range of motion secondary to tenderness, pain, and spasm.

The ALJ determined, "The claimant's reported symptoms of pain, fatigue, and limited motion are consistent with the objective medical and other evidence of record to the extent that he [sic] is limited to a range of sedentary work." AR 20. The ALJ continued, "However, the record is not consistent with complete inability to work." AR 21. From there, the ALJ noted Kym's objective lumbar spine examinations "either consistently indicated minimal objective lumbar findings, or simply reported no soft tissue swelling and no motor or sensory disturbances." *Id*. Further, the ALJ noted that "Even at her ER visit after a fall down a flight of stairs in July 2014, her examination revealed normal ranges of motion everywhere, normal strength, no neurological deficits, with normal motor movements and a normal gait." *Id*. The ALJ also pointed out that Dr. Arnold noted Kym's back pain was moderate in May 2015, and her NSAIDS, walking, and codeine/morphine-based analgesics provided moderate relief. Similarly, Kym's cervical spine pain was characterized as mild in December 2015, and her home

8

exercises, oral narcotics, and NSAIDs provided moderate relief. The ALJ then included a doctor's impression of Kym's January 2014 lumbar spine MRI.

The ALJ further explained that the "lack of significant objective findings continued through the remainder of the record, as the claimant's 2016 and 2017 examinations were unrevealing[.]" AR 21. The ALJ additionally concluded [o]ther evidence of record [was] not fully consistent with the claimant's statements about the intensity, persistence and limiting effects of symptoms, and thus lessen[ed] the weight given to those statements." *Id*. In support of that conclusion, the ALJ explained Kym was prescribed hydrocodone and morphine "largely on the basis of the claimant's subjective complaints," she reported numerous falls with complaints of left lower extremity radiculopathy but radiculopathy was not objectively demonstrated, and she had two falls during her 2014 PT which took place in inclement weather and fell in May 2015 because the horse she was riding bucked her off. The ALJ also emphasized that Kym's PT history was not totally successful "for reasons beyond the treatment, as her therapy was generally reported as well tolerated in 2014." AR 21. The ALJ cited the PT record which indicated Kym was in worse pain after her wife popped her back harder than normal in early February 2014, was in worse left leg pain after she sat on a wooden chair for several hours and fell on driveway ice in early March, and was in worsened pain with typical household and farm chores.

The ALJ also cited Kym's occupational therapy from February through April 2017 to address pain, strengthening, and the functional use of her left upper extremity. During that time, Kym objectively improved and external problems interfered with her recovery. In particular, when she was discharged it was expressly noted that Kym made "good progress in all areas with the exception of pain" and that she "tended to significantly overuse [her left upper extremity] doing woodworking and painting despite specific education on the need to rest."

9

AR 22. The ALJ then addressed Kym's daily activities, the records that demonstrated Kym engaged in woodworking and painting while treating for her left arm problems, and her use of a cane.

The ALJ gave no significant weight to the State Agency physicians' opinions, gave the consultative physical examiner's (CE) June 2014 opinion limited weight upon giving Kym the "benefit of the doubt" although there "was much that [was supported in the [examiner's] exam," and gave treating Dr. Arnold's medical source statement no weight. AR 23. The CE opined Kym could safely sit and stand, could walk greater than 50 feet without an assistive device, and could lift 20 pounds. Dr. Arnold opined that due to her lumbar spine impairment, Kym could lift no more than 10 pounds, could only sit for 45 minutes at a time and for only two hours in an eight-hour workday. Due to her back impairment, Kym could not stand for any length of time, had to get up and walk for five minutes at 30-minute intervals, could only stand and/or walk for two hours in a workday, and needed to take unscheduled breaks every 30 minutes, needed to use a cane, and was likely to be absent more than four days a month. The ALJ explained her reasons for rejecting Dr. Arnold's opinion and that she nevertheless "has given the claimant the benefit of the doubt and assessed her as restricted to sedentary work with limited walking and standing." AR 23. The ALJ further explained:

> It is only in the assessments that are consistent with the [RFC] in this decision that the foregoing [medical source statement] is given some weight. Otherwise, the opinions of Dr. Arnold are not consistent with the evidence and are given no weight herein.

AR 23. Finally, the ALJ determined Kym's then spouse's third party function report did "not impact the conclusion of this decision to the extent it is inconsistent with the above [RFC] assessment." AR 24.

## IV

Kym argues:  the ALJ's assessment of subjective complaints was patently wrong; and the ALJ failed to properly assess the medical evidence and RFC.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence.  *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision."  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision.  *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability.  *See* 20 C.F.R. § 404.1566[3].  The establishment of disability under the Act is a two-step process.

---

[3] The standards for establishing a disability in order to receive DIB and SSI are materially the same.  *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI).  Thus, the Court may at times only cite to the DIB regulations.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980).  The factual determination is made by using a five-step test.  *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)    currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)    suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)    suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)    is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)    is unable to perform any other work existing in significant numbers in the national economy.

*Id.*  An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other

type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Kym claims error on the ALJ's part at Step Four.

## A

Kym first argues that the ALJ's assessment of her credibility was not based upon substantial evidence and was erroneous for several reasons. The Commissioner counters that the ALJ properly evaluated Kym's subjective symptoms by thoroughly evaluating the evidence and Kym's complaints, and an ALJ's subjective symptom determination is given great deference.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

The ALJ properly considered the requisite factors such that substantial evidence supports the ALJ's conclusion that Kym's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. The ALJ noted Kim's daily activities included an instance of sitting for a long time without getting up (indicated in a 2014 physical therapy note), horseback riding as recently as May 2015 (indicated in a May 2015 emergency room record), household and

farm chores (indicated in a 2015 physical therapy note), light housework with breaks in-between, supervised her autistic son's hygiene and care, and could perform her own care and hygiene other than needing help with socks, shoes, or long garments. The ALJ also cited Kym's hearing testimony that she could sit for 30 to 45 minutes before standing due to back pain, could lift a gallon of milk without hurting herself, usually spent her day rotating from her chair to standing and moving around, and at her first hearing Kym admitted to some hobbies including picture taking. The record also revealed Kym painted and did woodworking while she was treated for left arm problems in April 2017, and she was noted to be independent with activities of daily living, homemaking, stair mobility, upper extremity dressing, and lower extremity dressing during a February 2017 occupational therapy evaluation. The foregoing activities were ripe for the ALJ's consideration and nothing in her Decision indicates she skewed such activities to equate them to Kym's ability to perform substantial gainful activity.

Throughout her Decision, the ALJ repeated Kym's pain complaints pertaining to her back, left leg, neck pain, left arm, and left lower extremity radiculopathy. The ALJ contrasted those complaints with evidence of lumbar fusion surgery in 2008, restricted range of lumbar motion in January 2014, deficits in her global cervical active range of motion in December 2015, objective lumbar spine examinations which consistently indicated minimal objective lumbar findings or reported no soft tissue swelling and no motor or sensory disturbances, normal ranges of motion everywhere, normal strength, normal gait, only mild neck pain in December 2015, a less than conclusive January 2014 lumbar spine MRI, no objective evidence of two bulging discs in her neck, no reported abnormality in either her back or upper extremities during 2016 and 2017 examinations, radiculopathy not objectively demonstrated in the record, and the

absence of the usual signs of severe pain such as abnormal weight loss or muscle atrophy.

With regard to the measures Kym used to relieve her pain including a TENS unit and physical therapy, she argues incorrectly that the ALJ found her incredible because she did not attend a pain clinic. Nowhere in the Decision did the ALJ rely upon Kym's failure to attend a pain clinic; the argument is a red herring. The Court also does not see in the Decision where the ALJ found Kym incredible because she discontinued physical therapy (PT). To the contrary, the ALJ discussed Kym's PT at length, the reasons for that therapy, the length of that therapy, how that therapy was tolerated by Kym, and intermittent setbacks outside of that therapy. Indeed, as the Commissioner points out, SSR 16-3p provides that "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, at *9. As for Kym's use of a TENS unit, she is correct that she used it even after the time highlighted by the ALJ when she allowed it to run of out medication and stopped using it voluntarily. Though the ALJ's statement suggests Kym ceased using the TENS unit altogether, the implication that statement made – that Kym's pain was not as bad as she said because she ceased treatment to improve her symptoms – is harmless in light of the Decision as a whole. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (explaining that administrative error may be harmless and thus a court ought not remand a case to the ALJ where it is convinced that the ALJ would reach the same result). The ALJ otherwise adequately considered the relevant factors as discussed herein. Also, it was not out of line for the ALJ to consider that Kym's pain was not as severe as alleged given that at one time she did simply let her TENS unit run out of medication.

In support of her conclusion that Kym was "notably restricted by her musculoskeletal ailments," the ALJ pointed to the medications and TENS unit she was prescribed, among other things. The ALJ also specifically addressed evidence of Kym's falls throughout the relevant time period. Of obvious significance to the ALJ in her consideration of how Kym's impairments and corresponding pain affected her were the events that preceded her falls: when Kym fell from the horse she was riding and in inclement weather (ice and snow). The ALJ also addressed Kym's July 2014 fall down a flight of stairs and the fact that her examination in the ER following that fall revealed normal ranges of motion everywhere, normal strength, no neurological deficits, and normal motor movements with normal gait. True, the ALJ did not refer to every instance in the record where Kym complained of falls, but the ALJ was not required to mention every piece of evidence. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion"). To the extent Kym argues the reason for her falls was due to pain, weakness, and her leg "giving out," she seems to ignore that the ALJ's RFC finding limited Kym to sedentary work including a restriction from situations involving ladders, scaffolds, and unprotected heights.

The ALJ did not shy away from the additional evidence indicative of the limiting effects of Kym's symptoms – her use of a cane. The ALJ reasoned earlier evidence in the record provided Kym was using her cane in the wrong hand which indicated a lack of proper training/therapy, in a November 2016 medical record Kym related that she could both walk a city block and climb a flight of stairs without problems, in a February 2017 occupational therapy evaluation record the therapist noted Kym was independent with ambulation, and in a March 2017 examination record the doctor noted Kym reported a history of falls due to weakness in her left leg and that she sued a cane as needed with "the implication

16

being that her use of the cane was intermittent."  AR 23.  Moreover, the ALJ elicited testimony from the VE that an individual's (with Kym's RFC) ability to perform the identified jobs who needed a cane or assistive device to ambulate to and from the workstation would not be affected.

Ultimately, the Court can trace the path of the ALJ's reasoning from the evidence of record to her conclusion that Kym's subjective complaints of pain and limitation were out of proportion to that evidence of record.  *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); *see also Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").  Notably, in her discussion of the evidence, the ALJ illustrated how certain evidence (i.e. Kym's fall from a horse) lent support for more than one factor (activities of daily living, location and intensity of pain, precipitating and aggravating factors).  As for Kym's argument that the ALJ imposed a requirement upon her that is not found in any of Social Security's regulations – that she prove a complete inability to work – it has no support in the actual analysis of the evidence in which the ALJ engaged.

**B**

Kym next argues that the ALJ erred in failing to give proper weight to the opinion of her treating doctor, Dr. Arnold, and the ALJ made multiple errors of law and fact in evaluating the medical opinions requiring reversal or remand.  The Commissioner disputes the ALJ made any such errors and instead argues that ALJ gave good reasons for not giving Dr. Arnold's opinion controlling weight and reasonably weighed his opinion in accordance with the regulations.

20 C.F.R. § 404.1527(c) provides:

How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating

source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include:  1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention.  *Id*.  Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2)[4].

After summarizing Dr. Arnold's June 2016 medical source statement, the ALJ noted "that the foregoing opinions are not consistent with the doctor's objective examination results."  AR 23.  She continued that although Kym consistently complained of pain, her examinations were "bereft" of objective findings that would support those complaints, none of Dr. Arnold's "very severe" limitations for sitting, walking, standing, etcetera and his high estimate of absences had "any medically determinable support," and beyond the assessments consistent with the RFC finding Dr. Arnold's opinions were given no weight as not consistent with the evidence of record.  *Id*.

The very regulation pursuant to which the ALJ was to consider Dr. Arnold's opinion explicitly provides that a treating physician's opinion is entitled to controlling weight if "well-supported by medically acceptable clinical and

---

[4] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration.  However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

18

laboratory diagnostic techniques."  20 C.F.R. § 404.1527(Cc)(2).  That the record did not include "MRI, other imaging or positive straight leg raise test results" to support radiculopathy was something the ALJ was within her authority to consider.  AR 23; *see Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018) ("To be sure, a lack of objective support from physical examinations and test results is relevant[.]").  Kym argues the ALJ mischaracterized the records to which she cited essentially because those records necessarily did not include the objective findings the ALJ seemed to expect.  She points to just one medical record (her May 2015 emergency room visit following a fall from a horse) which she argues indicated objective evidence of pain.  However, the ALJ acknowledged that record provided Kym was diagnosed with cervical strain and was treated with additional pain medication, and she thereafter continued to complain of and treat for neck pain after discharge and attended PT.  The ALJ considered Kym's January 2014 lumbar spine MRI and recited the radiologist's impression, albeit without additionally reciting the finding stated elsewhere in that record that there was "minimal posterior disk bulging."  AR 564.  As the Commissioner argues, no medical source cited such minimal disc bulges as the source of disabling limitations.  The ALJ also did not point to that MRI to conclude Kym lied about having bulging discs in her *back*.  Rather, the ALJ explained there was no objective evidence in the record to verify two bulging discs in Kym's *neck* which clearly factored into the ALJ's evaluation of Kym's subjective complaints.

In any event, the ALJ did not rely solely upon that one MRI to discount Kym's subjective complaints of pain or Dr. Arnold's opinion.  Additionally, the fact that one medical record to which Kym cites in her brief provides objective evidence of pain (after she fell from a horse) does not render the ALJ's Decision insufficiently supported or premised upon legal error.  Lastly, the ALJ did not reject Dr. Arnold's opinion solely upon her finding that Dr. Arnold prescribed

19

Kym hydrocodone and morphine based upon her subjective complaints. The Court must read the ALJ's Decision as a whole. *See Rice v. Barnhart*, 384 F.3d 363, 369, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole . . . ."). Kym fails to grasp that the ALJ considered the January 2014 MRI, her subjective complaints (properly, as discussed above), the objective evidence and lack thereof, and several other pieces of evidence to determine the consistency and supportability of Dr. Arnold's opinion.

Because the ALJ did not engage in an improper analysis of the medical evidence, she did not formulate an improper RFC and the Court need not consider Kym's conclusory argument in that regard any further. The fact that the ALJ gave Kym "the benefit of the doubt" in crafting the RFC does not somehow cause the ALJ's RFC finding to be erroneous. After all, the "determination of RFC . . . is an issue reserved to the [Commissioner]" and is based upon the Commissioner's consideration of "the entire record, including all relevant medical and nonmedical evidence, such as the claimant's own statement of what he or she is able or unable to do." *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner"); 20 C.F.R. §§ 404.1546(c) and 416.946(c). The ALJ's Decision is supported by substantial evidence and free of reversible legal error.

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 9) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 11) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision

of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Kym N-W, is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on October 21, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE

21